No. 24-7080

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

In Re: KIA HYUNDAI VEHICLE
THEFT MARKETING, SALE
PRACTICES, AND PRODUCTS
LIABILITY LITIGATION

This document relates to:
ALL CONSUMER CLASS ACTION
CASES

On Appeal from the United States
District Court for the Central District
of California

NO. 8:22-ml-03052-JVS-KES

The Honorable James V. Selna

---

**APPELLANT'S OPENING BRIEF**

---

Donald K. Birner, Esq.
256 Osprey Circle
Saint Marys, GA 31558
(309) 642-1589
d.birner@comcast.net
*Pro Se Objector*
Appellant

# DISCLOSURE STATEMENT

Not required by applicable rule.

**TABLE OF CONTENTS**

Page

DISCLOSURE STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ix

TABLE OF REGULATORY AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED FOR REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    CORE ISSUE: RECKLESS DISREGARD AND DECEIT BY
    DEFENDANTS FOR MONETARY GAIN . . . . . . . . . . . . . . . . . . . . . . . 3

    IMPACT ON CLASS MEMBERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    INADEQUATE ASA RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    RESPONSE FROM ATTORNEY GENERALS PERTINENT TO
    ASSOCIATED CRIMINAL CONDUCT . . . . . . . . . . . . . . . . . . . . . . . . . 6

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    PART ONE– LIMITATIONS AND DEFICIENCIES OF THE COMMON
    FUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.    THE ASA COMMON FUND LIMITATIONS AND
        DEFICIENCIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

iii

A.    The Floor of the Common Fund Is 65 Million. . . . . . . . . . . . 8

B.    The Common Fund Is Devoted Almost Exclusively to Actual Thefts or Attempted Thefts. . . . . . . . . . . . . . . . . . . . . . . . . . 8

C.    Many Class Members Who Had Their Car Stolen Do Not Qualify for Any Substantial Compensation from the Common Fund for a Multitude of Reasons. . . . . . . . . . . . . . . . . . . . . . 9

D.    The Universal Damages Affecting all Class Members Were Overlooked or Ignored by the ASA and the Court. . . . . . . . . 9

PART TWO—NON-CONFORMANCE WITH GOVERNMENT AND INDUSTRY STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

II.    FEDERAL STANDARD REQUIRES A STARTING SYSTEM THAT PREVENTS EITHER STEERING OR FORWARD SELF-MOBILITY OR BOTH OF WHICH IS LACKING IN ALL CLASS MEMBER VEHICLES FOR OVER A DECADE . . . . . . . . . . . . . 10

A.    Plain Language of Standard is Clear . . . . . . . . . . . . . . . . . . . . 10

B.    NHTSA Chief Counsel Interpretation . . . . . . . . . . . . . . . . . . 11

C.    NHTSA Reiterated its Position That the Standard Seeks to Ensure Thieves Could Not Bypass Ignition System . . . . . . . . 12

D.    Regulations Amending Theft Protection Clearly Required Immobilization System Designed So it Could Not Be Rendered Ineffective by Allowing a Vehicle to Move Under its Own Power . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

E.    The Lower Court Considered the Broad Standard Required by FMVSS 114 and Denied Defendants Motion to Dismiss in the Municipal Track Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

iv

III.    CLASS VEHICLES DO NOT CONFORM TO INDUSTRY
        STANDARDS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

IV.     DEFENDANTS ARE ACCOUNTABLE PURSUANT TO STRICT
        LIABILITY AND  COMMON LAW  CLAIMS. . . . . . . . . . . . . . . . 16

PART THREE—DEFENDANTS PREMEDITATED MISCONDUCT. . . 17

V.      KIA AND HYUNDAI CULTIVATED A PUBLIC IMAGE WHICH
        EMPHASIZE SAFETY WHILE KNOWINGLY PRODUCING
        MILLIONS OF VEHICLES WHICH VIOLATED SAFETY
        STANDARDS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VI      DISTRICT COURT RISK ANALYSIS FAILED TO CONSIDER
        DEFENDANTS' EXPOSURE TO ENHANCED COMPENSATORY
        AND PUNITIVE DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        A.    The District Court and Class Counsel are Fiduciaries
              for the Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        B.    The Retention of designated technical support by the court
              to insure a fair settlement was appropriate and harmonious
              With its role as fiduciary for the class . . . . . . . . . . . . . . . . . . 19

        C.    The District Court By Passed the Impact of Defendants
              Conscious Disregard for the Safety of its Consumers and
              the Public in its Risk of Litigation Assessment . . . . . . . . . .  20

        D.    Defendants Who Conceal Product Safety Risks Exposure to
              Substantial Compensatory Damages and Massive Punitive
              Damages if Litigation Occurs . . . . . . . . . . . . . . . . . . . . . . . . . 21

        E.    Culpable Corporations Faced with an Election to Litigant or
              Settlement Have Consented to Huge Settlements Rather than
              Risk Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        F.    It is Appropriate for the Trier of Fact to Consider the

v

Magnitude of Defendants' Harm to Others to Show
Reprehensibility, Recidivism and to Deter Repetition . . . . . . 22

G.    The Trial Court Should Have Retained Jurisdiction to Monitor
the Efficacy of the Software Update and the Progress or Any
Alternative Solution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

PART FOUR—THE UNFAIRNESS AND INADEQUACY OF THE
ASA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VII.  LOSS OF BARGAIN DAMAGES CONSTITUTES A UNIVERSAL
HARM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

A.    The Universal Injury to Class Members  Occurred at the
Moment of Purchase Not upon Resale . . . . . . . . . . . . . . . . . . 27

B.    Judge Selna Recognized Loss of Bargain Harm in Previous
Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

C.    Each Class Member has Suffered an Epitomizing Concrete
Economic Injury or Harm Due to a Universal Lack or Defect of
the Product Causing it to be Theft Prone . . . . . . . . . . . . . . . . 29

VIII.  IT IS UNJUST TO SEIZE A COLLATERAL INSURANCE ASSET
OF THE VICTIM TO REDUCE THE LIABILITY OF THE
TORTFEASOR WHO PAID NOTHING FOR THE ASSET . . . . . . 33

A.    The Offset for Insurance Is a Colossal Favor to an Undeserving
Recipient . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B.    Dependants Knew That Stolen Cars Constitute a Major Risk to
Life and Limb . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

C.    The Collateral Source Rule and its Policy Applies in
California . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

1.    The Parties Stipulated That the Settlement Agreement
      Shall Be Governed and Construed in Accordance with
      California Substantive Law . . . . . . . . . . . . . . . . . . . . . . 35

2.    The General Rule in Federal Court is That the CSR is
      Applied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

3.    The CSR Expresses a Firmly Established Policy
      Judgment to Encourage Citizens to Maintain Insurance
      to Protect Property Losses and Personal Injury . . . . . . 37

D.    It is Repugnant to Shift the Benefits of Plaintiffs' Insurance to
      the Tortfeasor . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

E.    The Majority Rule and Restatement of Torts in Product Cases
      Apply the Collateral Source Rule.. . . . . . . . . . . . . . . . . . . . . . . 38

F.    The Treatment of Insured Class Members in Relationship to
      Uninsured Members Offends Subsection D. Fed. R Civ Proc.
      23e(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

IX.   THE FORTY PER CENT DEDUCTION AFFORDED
      DEFENDANTS BY THE ASA IS UNJUSTIFIED AND
      UNREASONABLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

X.    THE BLACK BOOK WHOLESALE VALUATION IS A
      DISSERVICE TO CLASS MEMBERS PARTICULARLY THOSE
      WITHOUT INSURANCE BECAUSE MEMBERS REPLACE AT
      RETAIL VALUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

XI.   THE RELEASE ENCOMPASSES CIRCUMSTANCES NOT
      COVERED BY SETTLEMENT AGREEMENT . . . . . . . . . . . . . . 42

XII.   THE LACK OF ANY ESTIMATE OF THE AMOUNT  EXPECTED
       TO BE PAID OUT TO CLASS MEMBERS IS TROUBLESOME . 43

       A.   The Declaration of Defendants Expert Paid Expert Stockton Is
            Subjective and Not Credible . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

       B.   The Claims Made Rate for Consumer Cases is Decidedly
            Lower than Stated by Stockton . . . . . . . . . . . . . . . . . . . . . . . . 44

XIII.  DEATH AND PERSONAL INJURY CLAIMANTS SHOULD
       HAVE AVAILABLE AN INTENSIVE SETTLEMENT PROCESS
       (ISP) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

PROOF OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. Chi. Park Dist.*,
    927 F.2d 1014, 1023 (7th Cir. 1991)
    (cert. denied, 475 U.S. 1095 (1986) . . . . . . . . . . . . . . . . . . . . . . . . 27

*Amagasu v. Mitsubishi Motors Corporation,*
    Philadelphia County Court of Common Pleas case 181102406
    (2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Anderson Family v. General Motors Corp*,
    No BC -116926 (Sup Ct. Los Angeles Cty,. August 26, 1999. . . . . 25

*Andrews v. Plains All Am. Pipeline*, L.P.,
    No. CV154113PSGJEMX, 2021 WL 5283945, at *3
    (C.D. Cal. Nov. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Arambula v Wells*,
    72 Cal.App.4th 1006 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Arentowicz v. Cap Gemini Ernst Young U.S. LLC*,
    Civ. No. 03-5881 (WGB) (D.N.J ) (Jul. 16, 2004) . . . . . . . . . . . . . 37

*Bethel v. Home Depot U.S.A., Inc.*,
    No. 07cv0863 DMS (AJB) (S.D. Cal. Dec. 4, 2008) . . . . . . . . . 20, 21

*Blair v. Equifax Check Services, Inc.*,
    181 F.3d 832, 839 (7th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Bremen v. Zapata Off-Shore Co.*,
    407 U.S. 1, 15 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Cadapult Graphic Systems*,
    98 F. Supp. 2d at 564-65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Carriuolo v. Gen. Motors Co.*,
   823 F.3d 977, 986-87 (11th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . 31

*Cole v. Gen. Motors Corp.*,
   484 F.3d 717, 722-23 (5th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . 31

*Craig v. Boren*,
   429 U.S. 190, 194-95, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) . . . . . 31

*Culver v. City of Milwaukee*,
   277 F.3d 908 (7th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Debernardis v. IQ Formulations*,
   942 F.3d 1076, 1084 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . 31

*Ehrhardt v. Brunswick, Inc.*,
   186 Cal. App.3d 734, 741 (Cal.App. 4 Dist. 1986) . . . . . . . . . . 20, 21

*Eubank v. Pella Corp.*,
   753 F.3d 718, 723 (7th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*General Motors, LLC*,
   86 FR 48812-01, 2021 WL 3857555 (Aug. 31, 2021) . . . . . . . . . . . 7

*Grant v. Bethlehem Steel Corp.*,
   823 F.2d 20, 22 (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Greenfield v. Villager Industries, Inc.*,
   483 F.2d at 832 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Gustavsen v. Alcon Lab'ys, Inc.*,
   903 F.3d 1, 7-9 (1st Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Gypsum Carrier, Inc. v. Handelsman*,
   307 F.2d 525, 4 A.L.R.3d 517 (9th Cir. 1962) . . . . . . . . . . . . . . . . 37

x

*Helfend v. Southern California Rapid Transit District*,
     2 Cal.3d 1 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Hoch v. Allied-Signal*,
     24 Cal.App.4th at 61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Ileto* v. Glock, Inc.,
     349 F.3d at 1208, 1209 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*In re Asacol Antitrust Litig.*,
     907 F.3d 42, 47 (1st Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Cendant Corp. Litigation*,
     264 F.3d 201, 231 (3d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*,
     55 F.3d 768, 801-05 (3d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re JuulLabs Inc, Marketing Sales Practices and Prod. Liability Litigation*,
     609 F. Supp. 3d 942 (N.D. Cal. 2022) . . . . . . . . . . . . . . . . . . . . . . 32

*In Re Mercedes-Benz Tele Aid Contract Litigation*,
     257 F.R.D. 46, 58 (D.N.J. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re SW Airlines Voucher Litig.*,
     No. 11 C 8176, at *4 (N.D. Ill. June 22, 2016) . . . . . . . . . . . . . . . . 18

*In re Takata Airbag Prod. Liab. Litig.*,
     396 F. Supp. 3d 1101, 1121-22 (S.D. Fla. 2019) . . . . . . . . . . . . . . 31

*In re Toyota Motor Corp. Unintended Acceleration Litigation*,
     754 F. Supp. 2d 1145 (C.D. Cal. 2010) . . . . . . . . . . . . . . . . . 22, 29, 30

*In re Toyota Motor Corp.*,
     790 F. Supp. 2d at 1165 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

xi

*Johnson v. Ford Motor Co.*,
35 Cal.4th 1191, 1204 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kaiser v. BMW of N. Am., LLC*,
No. C-12-01311 DMR, 2013 WL 1856578, at *2
(N.D. Cal. May 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Kierstein v. Ostlund*,
Civ. No. 13-07513 (SRC) (D.N.J. Jul. 28, 2014) . . . . . . . . . . . . . . 37

*Kwikset*,
51 Cal.4th at 329, 120 Cal.Rptr.3d 741, 246 P.3d 877 . . . . . . . . . . 33

*Landeros v. Flood*,
17 Cal. 3d 399, 411 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Lewis v. Mercedes Benz U.S., LLC*,
530 F. Supp. 3d 1183 at 1203 (S.D Fla 2021) . . . . . . . . . . . . . . . 29, 31

*Lund v. San Joaquin RR*,
31 Cal.4th 1, (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Mars Steel Corp. v. Continental Illinois National Bank Trust Co.*,
834 F.2d 677, 681 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Maywalt v. Parker Parsley Petroleum Co.*,
67 F.3d 1072 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Melton v. Century Arms, Inc.* ,
243 F. Supp. 3d 1290, 1298-99 (S.D. Fla. 2017) . . . . . . . . . . . . . . 31

*Moorer v. StemGenex Med. Grp.*,
16-cv-02816-AJB-AHG (S.D. Cal. Oct. 26, 2021) . . . . . . . . . . . . . 47

*MSPA Claims 1, LLC v. Tenet Fla., Inc.*,
918 F.3d 1312, 1318 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . 30

xii

*Officers for Justice v. Civil Serv. Com.*,
    473 F. Supp. 801, 818. (N.D Cal. 1979) . . . . . . . . . . . . . . . . . . . . . . 27

*People v. Hamilton*,
    114 Cal.App.4th 932 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Phillip Morris U.S.A. v. Williams*,
    549 U.S. 346, 354-55 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Precht v. Kia Motors Am., Inc.*,
    No. 14-01148, 2015 WL 12684342, at *9
    (C.D. Cal. Apr. 8, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979, 989 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*State Farm Mut. Auto Ins. Co. v. Campbell*,
    538 U.S. 408, 418-19 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Stewart v. General Motors Corp.*,
    756 F.2d 1285, 1293 (7th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . 18

*Tijerina v. Alaska Airlines, Inc.*,
    22-cv-00203-JLS-BGS, at *8 (S.D. Cal. Nov. 7, 2022) . . . . . . . . . . 23

*United States v. Toyota Motor Corp.*,
    287 F. Supp 811,812 (S.D. N.Y. 2017) . . . . . . . . . . . . . . . . . . . . . . 22

*Weinberger v. Great Northern Nekoosa Corp.*,
    925 F.2d 518, 524 (1st Circuit 1991) . . . . . . . . . . . . . . . . . . . . . . . 19

*Wolin v. Jaguar Land Rover North America, LLC*,
    617 F.3d 1168 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Xavier v. Evenflo Co.* (In re Evenflo Co.),
    No. 22-1133 (1st Cir. Nov. 23, 2022) . . . . . . . . . . . . . . . . . . . . . . . 32

xiii

**Regulations**

Fed. R. Civ. P. 23(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 27, 40

33 Fed. Reg. 6,471 (Apr. 27, 1968) . . . . . . . . . . . . . . . . . . . . . . . . 11, 35

71 Fed. Reg. 17,752 (April 7, 2006) . . . . . . . . . . . . . . . . . . . . . . . . 12

49 C.F.R. Part 543 App. A 49 CFR § 543  par. (14) . . . . . . . . . . . . . . . . 13

49 C.F.R. § 571.114 S5.1.1 . . . . . . . .   1, 4, 10, 11, 12, 13, 14, 21, 40, 41, 42

**Other Authorities**

Jones Day, An Empirical Analysis of Federal Consumer Fraud Class
Action Settlements (2019-2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Manual for Complex Litigation (Fourth)
     § 21.644 at 329 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Restatement of Law of Aggregate Litigation Section 309 Court-
Designated Special Officers, Special Masters, Experts and other
Adjuncts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Restatement (Second & Third) of Torts § 920A(2) . . . . . . . . . . . . . . . . . 39

California Procedure, 6th (Witkin Library) Torts, § 1388 . . . . . . . . . . . . . 38

xiv

## TABLE OF REGULATORY AUTHORITIES

FMVSS 114" titled "Theft Protection and roll away prevention" at all relevant times requires manufacturers to install in each of their vehicles "a starting system which, whenever the key is removed from the starting system prevents: (a) The normal activation of the vehicle's engine or motor; and (b) Either steering, or forward self–mobility, of the vehicle, or both." 49 C.F.R. § 571.114 S5.1.1.

## STATEMENT OF JURISDICTION

This appeal is taken as of right from the District Court to the Ninth Circuit Federal Appellate Court by timely filing a notice of appeal on November 21st, 2024 (Doc #681)with the Clerk of the District Court within 30 days after entry of the District Court's FINAL JUDGMENT in the above captioned matter duly dated and filed on October 29, 2024- (Doc.#645)

## INTRODUCTION

Kia and Hyundai carefully cultivated a public persona that positioned the safety of its vehicles and its consumers on the highest pedestal, while in realty, were simultaneously mass producing millions of vehicles for over a decade that omitted a required theft prevention device that placed its purchasers and innocent bystanders safety in great peril.

The Leadership Declaration, [Dkt 378] which includes the attestation of

1

class counsel—relied upon by the court for its approval of substantial settlement incentives favoring defendants— touted purported defenses as notable litigation risks of plaintiffs, but is conspicuously silent concerning  defendants flagrant disregard for the safety and well being of its consumers**,** which reverberates throughout this matter and was worthy of a 'counter declaration' by a court appointed investigator exposing the weaknesses of defendants' case and their susceptibility to exemplary damages.

## ISSUES PRESENTED FOR REVIEW

Whether defendants complied with Federal Motor Vehicle Safety Standards or industry standards. [De novo review interpretation of Federal Reg.]

Whether the Amended Settlement Agreement (ASA) should have included reimbursement for loss of bargain damages sustained at moment of initial sale. *[ De novo review because lower court did not review such issue]*

Whether lower court analysis regarding risks of litigation should have considered defendants exposure to substantial compensatory and punitive damages. [Abuse of discretion review]

Whether the lower court fairly approved a deducted total loss by theft of 40% discount and a 67% partial loss discount in favor of defendants under the circumstances of this case. [Abuse of Discretion]

2

Whether the use of the Black Book values to ascertain fair market value is fair, reasonable or adequate. [Abuse of discretion]

Whether the lower court's approval of the use of class members insurance to offset the liability of defendants is warranted by law and the circumstances of this case.

De Novu review of the lawfulness of such incentives.

Whether the updated software fix is a reasonable solution and whether future thefts due to defective updated software are barred. [De Novo review future thefts barred legality of release]

Whether the court should have implemented an Intensive Settlement Process to provide for those *excluded* class members who suffered personal injuries or death as a result of a qualifying theft or attempted theft. [abuse of discretion]

## STATEMENT OF THE CASE

### CORE ISSUE:   RECKLESS DISREGARD AND DECEIT BY DEFENDANTS  FOR MONETARY GAIN

● Kia and Hyundai (and officers)reckless disregard for the safety and welfare of 8.6 million  consumers over a decade—by deliberately omitting essential theft prevention devices in their vehicles— exposes Kia and Hyundai to substantial compensatory and punitive damages.

3

- Auto producers disregard of safety standards and customer well-being was mostly unmentioned by the District Court and Class Counsel in their analysis.

**IMPACT ON CLASS MEMBERS**

- Vehicles were misleadingly sold as safe, did not comply with Federal Motor Safety Standard 114, or industry standards exposing owners to heightened risks of car- jacking, property loss, injury, and even death.

- Loss of bargain harm at the time of purchase caused significant universal economic injuries for class members which was completely overlooked by the District Court.

- Using class members insurance to offset defendants liability is unwarranted and rewards defendants mis-conduct while penalizing insured/victimized class members who maintained & paid for the insurance.

- It is repugnant to shift the benefit of the plaintiffs' insurance contracts to the tortfeasor in the form of reduced liability, when the tortfeasor paid nothing toward maintaining and paying for the insurance benefits.

- At least 2.4 million 'ineligible class cars' will remain in violation indefinitely posing extraordinary risk of theft and personal injuries or even death and be foreclosed from any recourse or relief by the expansive release.

4

**INADEQUATE ASA RESOLUTION**

- Instead of holding the defendants accountable for their calculated deception, the ASA grants them a *40%* damage deduction for total loss qualifying thefts and *67%* deduction for partial loss based upon merit-less defenses.

- Ironically the ASA allows Defendants to hijack class members comprehensive insurance to offset their damages caused by the automakers' concealed safety defect agenda

- Approximately 2.4 million vehicles remain ineligible for the proposed software update fix. And if these theft friendly vehicles are stolen in the future the expansive release approved by the court covering unknown, unsuspected, and potential future claims might unfairly and unreasonably foreclose any relief for the owners for future thefts

- The settlement value of $145 million claimed by the District Court is misleading; the floor is $80 million, minus $15 million in legal fees & costs leaving a net floor of $65 million. Empirically objective studies suggest the floor will not be exceeded in a claims made settlement ultimately allowing defendants to reap a net profit from their reckless actions.

- The take rate where class members are required to complete claim forms and provide documentation often for nominal sums is greatly exaggerated by

5

defendants paid expert and is inconsistent with objective empirical studies by independent third parties set forth below.

● If immobilizers only cost Kia & Hyundai $50 per vehicle as alleged in the complaint as a minimum, the total cost saved by defendants on 8.6 million vehicles would be $430 million plus interest, which significantly dwarfs the actual settlement amount.

● Confusing and vague claim procedures and undefined eligibility status.

● ASA gives defendants unbridled right to pro rate many payments to class members once the floor is reached leaving the value of the settlement uncertain, unknown and unstated

## RESPONSE FROM ATTORNEY GENERALS PERTINENT TO ASSOCIATED CRIMINAL CONDUCT

● The Attorney General from Minnesota wrote Judge Selna docket # 193 stating that the ASA failed to respond to the ongoing public safety crisis caused by Defendants theft prone _vehicles. Using Minneapolis alone as an example_ " _in 2022 thefts of Hyundai and Kia vehicles were tied to at least 5 homicides, 13 shootings, 36 robberies, 265 motor vehicle collisions. * and 9 deaths. pg 2 ¶ 2._

## SUMMARY OF ARGUMENT

The imperatives are twofold: (1) remove these defective unsafe theft

6

provoking vehicles from America's Roads and fix the defect in an expeditious manner to eliminate further property loss, personal injuries, as well as, loss of life; (2) fairly compensate those who had their car stolen but also those who lost the benefit of the bargain. This ASA does neither very well. The value of the settlement is illusory.

The widespread uncontrolled theft of Hyundai and Kia vehicles clearly and convincingly establishes that class vehicles' starting systems do not prevent engine activation, steering, or forward self-mobility when the key is removed from the starting system.

At least 2.4 million vehicles are ineligible for the update and many eligible vehicles will not obtain the software upgrade since the update is voluntary without personal notice to affected class members. [1]

Awarding an intentional tortfeasor with a 40% damages discount for total loss of vehicle and a 67% discount due to theft for partial loss of a vehicle— while permitting the offender to use the victimized class members' insurance to mitigate damages— is extravagant and shocking.

---

[1] See *General Motors, LLC*, Denial of Petition for Decision of Inconsequential Noncompliance, 86 FR 48812-01, 2021 WL 3857555 (Aug. 31, 2021) ["[A] manufacturer's decision to conduct a service campaign is not a substitute for conducting a recall since consumers will neither be notified of the noncompliance nor informed to return to the dealership for a free remedy."].

# ARGUMENT

## PART ONE– LIMITATIONS AND DEFICIENCIES OF THE COMMON FUND

<u>De Novo review since the lower court did not address the issue of loss of bargain</u>

## I. THE ASA COMMON FUND LIMITATIONS AND DEFICIENCIES

### A. The Floor of the Common Fund is 65 Million not 145.

The stated floor of the ASA is 80 million less the amount of attorney fees and costs that are scheduled to be paid from the common fund which is about 15 million leaving 65 million for class compensation or about 7 dollars per class member.

### B. The Common Fund Is Devoted Almost Exclusively to Actual Thefts or Attempted Thefts.

There is no doubt that auto thefts constitute a serious consequence of the premeditated design defect of the product, yet that harm only affects a relatively small percentage of class members. The Common Fund Assets are almost exclusively restricted to those members who had a qualifying theft or attempted theft or their class vehicles *and* failed to have carry comprehensive coverage. ASA II. D 2

Furthermore class members who have suffered personal injuries or death in

8

connection with the covered thefts are excluded from the ASA without even a

Intensive Settlement Process.(ISP)

**C. Many Class Members Who Had Their Car Stolen Do Not Qualify for Any Substantial Compensation from the Common Fund for a Multitude of Reasons**.

The class members who carried comprehensive coverage will not receive

any compensation for theft or attempted theft other a nominal capped discounted

sum ($300.00) if they purchase and install anti theft devices within a certain time

frame and must surrender any claim for increased insurance premiums due to the

theft, and since the cars produced span a decade or more the proof of loss will be

most difficult in many instances. Many of the cars will be unavailable.

**D. The Universal Damages Affecting all Class Members Were Overlooked or Ignored by the ASA and the Court.**

The loss of bargain damages or harm, which is common and typical to the

virtually all class members incurred upon purchase— are not covered by the

Common Fund or by the ASA, which factor alone requires disapproval of the ASA

and reversal of the approval Order.  The common injury affecting all class

members directly related to the deliberate concealment of a safety defect by Kia

and Hyundai is not addressed by the ASA. It unjustly permits Kia & Hyundai to

pocket its ill gotten gains gained by its omission.

9

**PART TWO—NON CONFORMANCE WITH GOVERNMENT AND INDUSTRY STANDARDS.**

**II. FEDERAL STANDARD REQUIRES A STARTING SYSTEM THAT PREVENTS EITHER STEERING OR FORWARD SELF-MOBILITY OR BOTH WHICH IS LACKING IN ALL CLASS MEMBER VEHICLES FOR OVER A DECADE.**

<u>Standard of review; De Novo Review is appropriate regarding the interpretation of a regulation.</u>

**A. Plain Language of Standard Is Clear.**

The court Order of approving ASA that since FMVSS No. 114 does not require an engine "immobilizer" defendants have a viable defense. (DKT No. 378, Ex 20)

This contention is misleading because although the standard 114 does not explicitly mention 'immobilizer' it does require a starting system that prevents "either steering, or forward self-mobility, of the vehicle, or both" as stated below:

> S5.1.1 Each vehicle must have a starting system which, whenever the key is removed from the starting system prevents:
> (a)     The normal activation of the vehicle's engine or motor; ***and***
> (b)     Either steering, or forward self-mobility, of the vehicle, or both. (emphasis supplied)

It is well known that class member vehicles do not have a starting system

10

which prevents "either steering or forward mobility of the vehicle or both." Once the keyless thief starts the cars with a screwdriver or USB plug he or she drives the vehicle away unhindered because the starting system does not prevent steering or forward mobility when the ignition is bypassed. The allegations of the Complaint and videos on the internet were the catalyst for defendants attempt to shift blame for its design defect upon the Kia Boyz. The plain meaning and language of the standard is unambiguous.

### B.     NHTSA Chief Counsel Interpretation

NHTSA/ Interpretation # GF005229-2 authored by NHTSA chief counsel Jacqueline Glassman dated 9/24/04 interpreting S4.2 [now S5.1] of the Federal Motor Vehicle Safety Standard (FMVSS No. 114)  Theft Protection in a letter to an unnamed inventor states:

> *We note that in promulgating FMVSS No. 114, the agency expressed concern about car thieves who could bypass the ignition lock. In response to this concern, the **agency decided to require a device**, which would prevent either self-mobility or steering even if the ignition lock were bypassed (see 33 FR 4471, April 27, 1968).* [emphasis supplied]
> \*                    \*                              \*
> *The engine control module immobilizer described in your letter satisfies the requirements of S4.2(b) because it locks out the engine control module if an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system. When the engine control module is locked, the vehicle is not capable of forward self-mobility because it is incapable of moving forward under its own power.* ref 114 d. 9/24/04

11

Defendants' subject vehicles lack any device that locks out the engine control module if *an attempt is made to start the vehicle without the correct key or to bypass the electronic ignition system* [e.g hot wire] nor do defendants vehicles prevent forward mobility by means locking the engine control module. Instead once the cars are started the thieves drive away with operational steering and forward mobility. To suggest that the standard is not violated is ludicrous. The massive flagrant thefts of Kia's and Hyundia vehicles make this defect quite obvious.

The consolidated complaint Docket #84 par. 1301 (and many other paragraphs) do not limit the device to an immobilizer but state to wit:

> 1301 The Class Vehicles do not comply with FMVSS No. 114 because they do not contain a meaningful anti-theft device, such as an immobilizer or other effective anti-theft features that prevent the normal activation of the vehicle's engine without a valid key.

## C. NHTSA Reiterated its Position that the Standard Seeks to Ensure Thieves Could Not Bypass Ignition System.

Indeed in 2006, NHTSA reiterated that its "safety standard on theft protection [FMVSS No. 114] specifies vehicle performance requirements intended to reduce the incidence of crashes resulting from theft and accidental rollaway of motor vehicles." *See* 71 Fed. Reg. 17,752 (Apr. 7, 2006). NHTSA goes on to make clear that "the standard sought to ensure that the vehicle could not be easily

12

operated without the key" and that "thieves… could [not] bypass the ignition lock." *Id*. at 17,752-53.

**D. Regulations Amending Theft Protection Clearly Required Immobilization System Designed So it Could Not Be Rendered Ineffective by Allowing a Vehicle to Move Under its Own Power.**

It is further noted that 49 CFR Part 543 App. A 49 CFR §543 par. (14)

—provides in specific:

> that the immobilization system must be designed to meet so that it cannot easily be defeated to allow forward self propulsion by disrupting the voltage or by using tools auto thieves commonly rely upon on; Scissors, wire-strippers, wire cutters and electrical wires, a hammer, a slide hammer, a chisel, a punch, a wrench, a screwdriver, pliers, steel rods and spikes, a hacksaw, a battery operated drill, a battery operated angle grinder; and a battery operated jigsaw.

> 49 CFR §543 states in par. (13),

> "The immobilization system shall be designed so that it can neither be bypassed nor rendered ineffective in a manner that would allow a vehicle to move under its own power, or be disarmed, using one or more of the tools and equipment listed in paragraph (14) of this appendix: (I) Within a period of less than 5 minutes, when tested as installed in the vehicle; or (ii) Within a period of less than 2.5 minutes, when bench-tested outside the vehicle." NOTE: C.R.C, c. 1038.114, regulations amending Theft Protection and roll away prevention- 5standard 114 in effect March 30, 2001.

**E. The Lower Court Considered the Broad Standard Required by FMVSS 114 and Denied Defendants Motion to Dismiss in the Municipal track case.**

Furthermore, the trial court Judge Selna presiding, in a municipal track

13

matter via a chambers order dated 9/6/24 regarding a motion to dismiss (City of Lorain) [596] denied the motion. Defendants argued that Tacoma's claim was preempted because it frustrated the flexibility of FMVSS by imposing too narrow of a requirement by requiring an immobilizer per se. This court responded by referring to the GE plaintiffs order stating that defendants mis-characterize the scope of the claims. Throughout the complaint plaintiffs used broad language to describe what would have been permissible conduct by Defendants, such as "standard anti-theft technology, common anti-theft technology and industry standard anti-theft. Hence the court ruled the Lorain Complaint's reference to "anti theft technology" is consistent with the broad standard for required devices under FMVSS 114 and denied the motion to dismiss. [See pg. 5 of Dkt 596]

Likewise in this matter, the Amended Consolidated Complaint states time and again that:

> "*Class Vehicles do not comply with FMVSS No. 114 because they do not contain a meaningful anti-theft device, such as an immobilizer or other effective anti-theft features that prevent the normal activation of the vehicle's engine without a valid key.*" 1301

These allegations allege the lack of meaningful anti theft devices such as an immobilizers sufficient to establish the lack of compliance with the Standard 114. The erroneous claim that the standard does not mention immobilizers per se

14

therefore defendants' products complied with the standard is sophistry.

## III. CLASS VEHICLES DO NOT CONFORM TO INDUSTRY STANDARDS.

Beginning with at least the 2000 model year vehicles, immobilizers were standard on 62% of models sold by Defendants' competitors in the U.S. market, and by the 2008 model year  90% immobilizers were standard competitors' vehicles sold in the U.S..  Immobilizers were standard in defendants pricier vehicles.

It is undeniable that defendants knowingly manufactured vehicles without theft prevention equipment— that was standard equipment on almost all of its competitors vehicles— causing unreasonable and unnecessary risk of property damage, personal injury and fatalities. "Engine immobilizers were standard in 96 percent of other new cars by 2015, including the same Kia and Hyundai models the companies sold in Canada and Europe, according to the attorneys general, but were only installed in 26 percent of Kia and Hyundai models in the U.S. that same year."  See also ¶1343 of amended consol complaint. "HMC and KC sell the very same, or substantially similar vehicles to the Class Vehicles in other countries, with one major difference.

HMC and KC vehicles sold in Europe (since 1998), Australia (since 2001)

15

and Canada (since 2007) have engine immobilizers. For example, in the 2020 Kia Sportage Owner's Manual for Canada, Kia notes that the "vehicle is equipped with an electronic engine immobilizer system to reduce the risk of unauthorized vehicle use."

Undoubtably, if class members had been advised that these vehicles violate both government and industry standards—either they would not have purchased these vehicles or would have paid less for such vehicles. This less than candid process was repeated time and again for over a decade by defendants. The initial damages incurred result from non-disclosure of a known omission.

Yet defendants game plan attempts to shift blame to third parties including the very crooks they emboldened and enabled by the lack of immobilizers or other preventive devices.

## IV. DEFENDANTS ARE ACCOUNTABLE PURSUANT TO STRICT LIABILITY AND COMMON LAW CLAIMS.

Aside from the failure of the cars to conform to Governmental and Industry Standards, defendants are accountable as alleged by the Consolidated Complaint (Doc.#84) based upon Strict Liability ( unreasonably dangerous based upon product defect) Failure to warn; Negligence (failure to exercise reasonable care to ensure product safety), Breach of express and implied warranties (unfit for

16

intended use), Misrepresentation by omission/concealment.

## PART THREE—DEFENDANTS PREMEDITATED MISCONDUCT

**V.  KIA AND HYUNDAI CULTIVATED A PUBLIC IMAGE WHICH EMPHASIZE SAFETY WHILE KNOWINGLY PRODUCING MILLIONS OF VEHICLES WHICH VIOLATED SAFETY STANDARDS.**

Hyundai and Kia have both emphasized safety in their marketing campaigns with catchy slogans to wit:

**Hyundai**:
**"Safe and Secure"** - Highlighting Hyundai's commitment to safety features and secure driving.

**"Drive with Confidence"** - Emphasizing the reliability and safety of Hyundai vehicles.

**"Your Safety, Our Priority"** - Stressing Hyundai's focus on customer safety.

**Kia**:
**"Safety for Every Journey"** - Promoting the comprehensive safety measures in Kia vehicles.

**"Drive Safe, Drive Kia"** - Reinforcing the idea that Kia vehicles are designed with safety in mind.

**"Built for Safety"** - Highlighting Kia's dedication to building safe and reliable cars

Simultaneously KIA & HYUNDAI both produced cars by the millions that were theft prone, violated safety standards and exposed its consumers to the grave dangers often associated with vehicle thefts.

17

## VI. DISTRICT COURT'S RISK ANALYSIS FAILED TO CONSIDER DEFENDANTS' EXPOSURE TO ENHANCED COMPENSATORY AND PUNITIVE DAMAGES.

### A. The District Court and Class Counsel are Fiduciaries for the Class.

Rule 23 (e) is understood as imposing a fiduciary duty on the district court that is non delegable. See *Stewart v. General Motors Corp.*, 756 F.2d 1285, 1293 (7th Cir. 1985); *Maywalt v. Parker Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995); *Greenfield v. Villager Industries, Inc.*, supra, 483 F.2d at 832. *Culver v. City of Milwaukee*, supra, 277 F.3d at 915; *In re Cendant Corp. Litigation*, 264 F.3d 201, 231 (3d Cir. 2001); *Grant v. Bethlehem Steel Corp.*, 823 F.2d 20, 22 (2d Cir. 1987)[ "*We and other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries.]* "

Class counsel owes a fiduciary duty to the class as well". *Eubank v. Pella Corp.*, 753 F.3d 718, 723 (7th Cir. 2014)" *In re SW Airlines Voucher Litig.*, No. 11 C 8176, at *4 (N.D. Ill. June 22, 2016)

> The lawyer for the class is not hired by the members of the class and his fee will be determined by the court rather than by contract with paying clients. The cases have remarked the danger that the lawyer will sell out the class in exchange for the defendant's tacit agreement not to challenge the lawyer's

18

fee request.[2]) *Culver v. City of Milwaukee*, 277 F.3d 908, 910 (7th Cir. 2002)

**B.    The Retention of Designated Technical Support by the Court to Insure a Fair Settlement Was Appropriate and Harmonious with its Role as Fiduciary for the Class**.

In the event the court harbored any doubt whatsoever that the class vehicles violated Federal Safety Standards by lacking required theft prevention devices it could have designated an expert or consultant to examine the a class vehicle and resolve any such dilemma.

Regarding the overall fairness of the proposed settlement it has been said;

In determining whether a proposed settlement is fair, reasonable, and adequate, "[t]he primary concern is with the substantive terms of the settlement: `Basic to this . . . is the need to compare the terms of the compromise with the likely rewards of litigation.'" (internal citations omitted)    *Maywalt v. Parker Parsley Petroleum Co.*, 67 F.3d 1072, 1079-80 (2d Cir. 1995)

Relative to the substantive terms of the proposed settlement the court accepted without question the unsupported declarations of paid expert Stockton as well as class counsel who possesses a vested interest to settle.

In order to protect the interests of the class the court could well have

---

[2] *Blair v. Equifax Check Services, Inc.*,181 F.3d 832, 839 (7th Cir. 1999); *Mars Steel Corp. v. Continental Illinois National Bank Trust Co.*,834 F.2d 677, 681 (7th Cir. 1987); *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*,55 F.3d 768, 801-05 (3d Cir. 1995); *Weinberger v. Great Northern Nekoosa Corp.*,925 F.2d 518, 524 (1st Circuit 1991

designated a neutral economist to gain an objective vision of the proposed settlement, but did not do so. The court also discussed the plaintiffs' alleged risks of litigation but not the defendants risks of litigation which are enormous. And the court ignored the likely rewards of litigation in terms of enhanced compensatory and punitive damages due to defendants reckless indifference to class members safety.

**C.   The District Court By Passed the Impact of Defendants Conscious Disregard for the Safety of its Consumers & the Public in its Risk of Litigation Assessment.**

The District Court significantly undervalued plaintiffs claims and at the same time did not mention the lack of merit of defendants primary defenses —particularly when the court had already ruled *against* defendants on three different occasions relative to those same defenses in the other track cases. Nonetheless the Court accepted class counsel's characterization, who has a vested financial interest in settling the case, that the defenses were valid.  See *Ehrhardt v. Brunswick, Inc.*, 186 Cal. App.3d 734, 741 (Cal.App. 4 Dist. 1986) and *Bethel v. Home Depot U.S.A., Inc.*, No. 07cv0863 DMS (AJB) (S.D. Cal. Dec. 4, 2008) [*"Punitive damages may be awarded in a product liability action if it is shown that the defendant placed a product on the market in conscious disregard of the safety of consumers and others."*]

20

Defendants conscious disregard for the safe use of over 8.6 million vehicles by concealing its intentional omission of theft prevention devices which upon the keyed ignition being bypassed prevents forward steering or mobility or both of the vehicle required by both industry and governmental standards. FMVSS 114, id.

### D. Defendants Who Conceal Product Safety Risk Exposure to Substantial Compensatory Damages and Massive Punitive Damages If Litigation Occurs.

"Punitive damages may be awarded in a product liability action if it is shown that the defendant placed a product on the market in conscious disregard of the safety of consumers and others." *Ehrhardt v. Brunswick, Inc.*, 186 Cal. App.3d 734, 741 (Cal.App. 4 Dist. 1986) *Bethel v. Home Depot U.S.A., Inc.*, No. 07cv0863 DMS (AJB) (S.D. Cal. Dec. 4, 2008) To establish conscious disregard, a plaintiff must show "that the defendant was aware of the probable dangerous consequences of his conduct, and that he wilfully and deliberately failed to avoid those consequences." See *Hoch v. Allied-Signal*, 24 Cal.App.4th at 61. ( allegation of false latching condition of ladder conscious disregard a question of fact for the jury.)

The MDL consolidated at least 76 class actions across the country, which if not settled during the MDL phase, and returned to their original venues would force defendants to face juries, who so often have not countenance companies who

21

*create and conceal* safety defects that are substantial factors in causing

devastating consequences.

> **E.    Culpable Corporations Faced with an Election to Litigant or Settlement Have Consented to Huge Settlements Rather than Risk Trial.**

Indeed Honorable Judge Selna presided over *In re Toyota Motor Corp.*

*Unintended Acceleration Litigation* 754 F. Supp. 2d 1145 (C.D. Cal. 2010), where

Toyota covered up the product's unintended acceleration defect, resulted in a

settlement civilly for over *one billion* dollars. And in the associated criminal

proceeding of *United States v. Toyota Motor Corp.* 287 F. Supp 811,812 (S.D.

N.Y 2017) pursuant to a deferred prosecution agreement ("DPA") Toyota agreed

to pay a $1.2 billion criminal penalty and cooperate with an independent monitor

for a three- year period.

> **F.    It is Appropriate for the Trier of Fact to Consider the Magnitude of Defendants' Harm to Others to Show Reprehensibility, Recidivism and to Deter Repetition.**

It is appropriate for the trier of fact to consider the magnitude of the

concealed safety defect affecting 8.6 million vehicles and countless thefts, injuries

and even deaths for more than a decade because evidence of reprehensibility or

recidivism are pertinent factors in assessing culpability for the punitive damages.

The harm to others can be offered as evidence.

In addition evidence of defendants' harm to others can be offered to show reprehensibility which is a relevant factor in the punitive damages equation. "See *Phillip Morris U.S.A. v. Williams*, 549 U.S. 346, 354-55 (2007); *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 418-19 (2003)" *Tijerina v. Alaska Airlines, Inc.*, 22-cv-00203-JLS-BGS, at *8 (S.D. Cal. Nov. 7, 2022) "In interpreting State Farm and other U.S. Supreme Court precedent, the California Supreme Court held that when determining punitive damage liability, it is appropriate for a trier of fact to consider "illegal or wrongful conduct toward others that was similar to the tortious conduct that injured the plaintiff," because "a civil defendant's recidivism remains pertinent to an assessment of culpability. See *Andrews v. Plains All Am. Pipeline, L.P.*, No. CV154113PSGJEMX, 2021 WL 5283945, at *3 (C.D. Cal. Nov. 2021) (citing *Johnson v. Ford Motor Co.*, 35 Cal.4th 1191, 1204 (2005)); *Kaiser v. BMW of N. Am.*, LLC, No. C-12-01311 DMR, 2013 WL 1856578, at *2 (N.D. Cal. May 2013) (same). *Tijerina v. Alaska Airlines, Inc*. 22-cv-00203-JLS-BGS, at *8 (S.D. Cal. Nov. 7, 2022)

Defendants paid expert assumed approximately 2500 Kia and Hyundai class cars were stolen. Government studies estimate that stolen cars are 200 times more likely to be involved in accidents than cars that are not stolen. Unfortunately there are no doubt countless persons who, have been traumatically injured during the course of the thefts of these theft provoking vehicles whose harm can be presented to the trier of fact as well as the fatalities that have occurred.

Concealment of or failure to warn about product safety defects for the sake of profits over the welfare or safety of class members and society has been dimly viewed by juries who have assessed in a number of instances generous

compensatory and massive punitive damage verdicts.

The fact Defendants targeted the U.S. with theft prone vehicles will not sit well with juries composed of U.S. citizens upon jury members being informed that Class Vehicles produced by Defendants for the United States market would not be allowed to be sold in the E.U., Australia, Canada, or other markets, that require engine immobilizers or other meaningful devices.

The following cases illustrate juries awarding significant compensatory damages and massive punitive damage, which would have given class plaintiffs considerable leverage during negotiations.[3]

[In this case similar reasoning would multiply the cost savings on 8.6 million vehicles, which were sold for over a decade, along with defendants continued insistence they committed no wrong coupled with its refusal to install the needed theft prevention device in class vehicles would not bode well at trial.]

---

[3]In *Johnson v. Monsanto Co.*, a one plaintiff case a California jury awarded Dewayne Johnson $289 million in damages after he was harmed by Monsanto's Roundup product. Mr. Johnson's lawsuit was the first of the Roundup-cancer-lawsuits to make it to trial. He alleged that his exposure to the Roundup weed killer caused him to develop non-Hodgkin's lymphoma. 250 million in punitive damages for failure to warn consumers about the cancer-causing properties of Roundup.

In a binary litigation case, Plaintiff Mike Force suffered a traumatic brain injury in an automobile accident after his seatbelt failed. Force filed a lawsuit against Ford Motor Company and Mazda Motor Company claiming defective seat belt design known but uncorrected by defendants. The jury awarded $32.5 million in damages and agreed that the design and manufacture of the seatbelt in Force's vehicle was defective. An example of enhanced compensary damages.

*Anderson Family v. General Motors* (1993): The jury awarded $4.9 billion in punitive damages to the family after their van exploded in a collision, causing severe injuries. Reduced to 1.09 billion by Judge At the heart of the case against General Motors was a 1973 internal memo sent to General Motors management from an engineer which estimated that the litigation cost for accidents involving the gas tank would be $2.40 per vehicle.  In contrast, the cost of moving the fuel tank to a safer location would cost the auto manufacturer $8.59 per vehicle. This evidence demonstrated that General Motors made a calculated decision to put its own profits over the safety of its customers, leading to the devastating injuries suffered by the Anderson family.

 In the case here the election not to install theft devices is also a calculated decision by defendants and its officers to [repeatedly] elevate corporate profits

25

over the safety of its customers for more than a decade rendering over 3 quarter of a billion theft prone vehicles with ensuing consequences.

More recently in *Francis Amagasu v.Mitsubishi Motors Corporation* (2023): Mitsubishi was ordered to pay $980 million [$180 million in compensatory damages and $800 million in punitive damages] in the verdict by a Philadelphia County jury related to a 2017 rollover crash in a Mitsubishi 3000 GT where the seat belt did not operate properly due to a known but uncorrected seatbelt defect, according to Law 360.

In most of these cases the manufacturer did not intend to produce a defective product or component but failed to be candid about its existence.

Here the defendants Kia and Hyundai *intended* to omit a require safety device rendering the product defective. Furthermore they actively concealed the defect and failed to warn.

**G.** **The Trial Court Should Have Retained Jurisdiction to Monitor the Efficacy of the Software Update and the Progress or Any Alternative Solution**.

The ASA conferred upon the court the right to monitor the progress and efficacy of the software update but the court apparently did not wish to do so. The court should be ordered to do so retain jurisdiction and under appropriate circumstances designate one or more monitors or special masters to ensure any

approved settlement is fair and reasonable from the prospective of the class and implemented as well. See <u>Restatement of Law of Aggregate Litigation section 309 Court- Designated Special Officers, Special Masters, Experts and other Adjuncts.</u>; *Officers for Justice v. Civil Serv. Com.*, 473 F. Supp.801, 818. (N.D Cal. 1979); Manual for Complex Litigation (Fourth) § 21.644 at 329 (2004)

Retaining jurisdiction after a class action settlement agreement has been finally approved and the case has been dismissed "is consistent with [the court's] responsibility, pursuant to Fed.R.Civ.P. 23, to protect the interests of class members." *Alexander v. Chi. Park Dist.*, 927 F.2d 1014, 1023 (7th Cir. 1991) (cert. denied, 475 U.S. 1095 (1986)).

## PART THREE—THE UNFAIRNESS AND INADEQUACY OF THE ASA

## VII. LOSS OF BARGAIN DAMAGES CONSTITUTE A UNIVERSAL HARM.

### A. The Universal Injury to Class Members which Occurred at the Moment of Purchase Not upon Resale.

Objector's loss of bargain claim as stated in Plaintiffs' Amended Consolidated Complaint is the *immediate diminished value* at the time of the purchase due to class vehicles latent undisclosed design defects present from the beginning.

27

The District Court in this matter overlooked the distinction between loss of bargain or benefit with diminution upon future resale which is a decidedly different form of damage. The loss of bargain or benefit creates 'out of pocket' cost or expense and is not dependent upon a any future sale. It isn't about a decline in future value it is about initially over paying for a unsafe defective car. The Judge's misapprehension led him to conclude based purportedly upon expert Stockton Supp. Declaration [DKT, No 532 Ex 1] that diminished value need not be included.

It is worthy to note that Stockton Supp. Declaration does not mention loss of bargain or loss upon purchase whatsoever, although he, in fact, did mention and endorse the loss of bargain concept in the VW pollution case. (Doc.#629) pgs 24-26. See 10. Diminution in Value.

Class members overpaid for *theft prone defective* class vehicles *"at the time of purchase,"* a loss defendants and Class counsel wholly ignore. Even if a fix is later applied it doesn't change the fact that plaintiffs overpaid at the time of sale and were defendants unjustly enriched.

**B.      Judge Selna Recognized Loss of Bargain Harm in Previous Case.**

28

Previously the loss of bargain harm at the time of purchase was duly recognized by Judge Selna in *In re Toyota Motor Corp.Unintended Acceleration Mktg* 790 F. Supp. 2d 1152,1165 to wit:

> "If the Court accepts the allegations that all Toyota vehicles had the safety defect at the time of purchase, and the defects were not subsequently remedied through recalls, all Plaintiffs suffered an economic loss at the time of purchase because they received a defective vehicle. The fact that Plaintiffs discovered this defect after the time of purchase is of no moment. The economic loss was present from the beginning." *In re Toyota Motor Corp. Unintended Acceleration Mktg.*, 790 F. Supp. 2d 1152, 1165 (C.D. Cal. 2011)

The clause quoted immediately above is cited with favor 46 times including:

*Lewis v. Mercedes Benz U.S.*, LLC 530 F. Supp. 3d 1183 at 1203 (S.D Fla 2021) [defective headrest unpredictably deploying suddenly] with the Lewis Court concluding:

> Plaintiffs bargained for safe vehicles free of defective headrests, but instead received unsafe vehicles with defective head rests. This overpayment constitutes an economic injury that is sufficient to confer standing.
>
> *    *    *
>
> "A vehicle with a defect is worth less than one without a defect. The overpayment for the defective, unsafe vehicle constitutes the economic-loss injury that is sufficient to confer standing." *In re Toyota Motor Corp.. Unintended Acceleration Mktg.*, 790 F. Supp. 2d 1152, at 1163-1165 (C.D. Cal. 2011)  Additionally, "the Court independently determines that Plaintiffs satisfy the standing

requirements under the UCL, FAL, and CLRA." *In re Toyota Motor Corp.. Unintended Acceleration Mktg.*, at 1168 (C.D. Cal. 2011)

### C. Each Class Member has Suffered an Epitomizing Concrete Economic Injury or Harm Due to a Universal Lack or Defect of the Product Causing it to be Theft Prone.

It is well established that even if an individual class member's theft prone vehicle has not been subject to theft, each has suffered a concrete monetary or economic injury because the vehicles were prone to theft depriving each of the benefit of his or her bargain upon purchase. This constitutes injury that is not cured by the software update because class members overpaid for cars that possessed concealed safety defects. See *Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168 (9th Cir. 2010) (premature tire wear defect present need not manifest in a majority of class vehicles)

Moreover the software upgrade does not render the cars compliant with FMVSS 114. Moreover if the software update is a flop defendants liability and class members remedy is strictly limited to repair or re-performance. ASA II A. 2 Therefore, future claims are foreclosed per the ASA if the update fizzles.

An economic injury is the "epitome" of a concrete injury. *MSPA Claims 1, LLC v. Tenet Fla., Inc.* , 918 F.3d 1312, 1318 (11th Cir. 2019). "A person experiences an economic injury when, as a result of a deceptive act or an unfair

30

practice, he is deprived of the benefit of his bargain." *Debernardis v. IQ Formulations* , 942 F.3d 1076, 1084 (11th Cir. 2019) [4]

In the case at bar, class members paid for safe vehicles with adequate theft prevention devices such as immobilizers or its equivalent in place and did not receive them.

*In Re Mercedes-Benz Tele Aid Contract Litigation*, 257 F.R.D. 46, 58 (D.N.J 2009) To the same effect see: *Melton v. Century Arms, Inc.* , 243 F. Supp. 3d 1290, 1298-99 (S.D. Fla. 2017) (denying a motion to dismiss for lack of standing where plaintiffs alleged they suffered "economic harm such as overpayment, loss of value, or loss of usefulness emanating from the loss of their benefit of the bargain" stemming from an alleged nondisclosure of manufacturing defect (rifle prone to accidentally firing when safety selector was on) that had not manifested or otherwise injured plaintiffs)*; In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1121-22 (S.D. Fla. 2019) (defective airbags capable of being deployed"); *Precht v. Kia Motors Am., Inc.* , No. 14-01148, 2015 WL 12684342, at *9 (C.D. Cal. Apr. 8, 2015) (defective car overpayment) See *Cole v.*

---

[4] (citing *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 986-87 (11th Cir. 2016)). *Craig v. Boren*, 429 U.S. 190, 194-95, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976)).  *Lewis v. Mercedes-Benz U.S.*, LLC, 530 F. Supp. 3d 1183, 1202 (S.D. Fla. 2021)

*Gen. Motors Corp.*, 484 F.3d 717, 722-23 (5th Cir. 2007)(defective airbags)

addition see: And in *Xavier v. Evenflo Co.* (In re Evenflo Co.) No. 22-1133 (1st

Cir. Nov. 23, 2022) [Held that car seats contained a universal defect and were not

tested and safe as advertised so plaintiffs overpaid for all products.]

"This court has repeatedly recognized overpayment as a cognizable form of

Article III injury." See *Gustavsen v. Alcon Lab'ys, Inc.*, 903 F.3d 1, 7-9 (1st Cir.

2018); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 47 (1st Cir. 2018) (recognizing

"injury in the form of lost money fairly traceable to an allegedly unlawful

supra-competitive price").

As the Central District Court (Hon. Judge Selna presiding) aptly observed in

*Toyota*, id,

> "this argument succeeds only if one assumes that a plaintiff who has not
> experienced a safety defect does not have a safety defect. . . . [A]ll Plaintiffs
> suffered an economic loss at the time of purchase because they received a
> defective vehicle. . . . *The economic loss was present from the beginning.*"
> *In re Toyota Motor Corp.*, 790 F. Supp. 2d at 1165. [emphasis supplied]

> "In the eyes of the law a buyer forced to pay more that he or she would have
> is harmed at the moment of purchase, and further inquiry into subsequent
> transactions, actual or hypothesized, ordinarily is unnecessary."

> In re *Juul Labs Inc, Marketing Sales Practices and Prod. Liability
> Litigation*, 609 F. Supp. 3d 942 (N.D. Cal. 2022)

Where plaintiffs are "deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately." *Kwikset*, 51 Cal.4th at 329, 120 Cal.Rptr.3d 741, 246 P.3d 877 (emphasis in original) *Pulaski & Middleman, LLC v. Google, Inc*., 802 F.3d 979, 989 (9th Cir. 2015)

"Applying these concepts to other forms of fraudulent omission, UCL and FAL restitution is based on what a purchaser *would have paid at the time of purchase* had the purchaser received all the information." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015) (emphasis supplied) Again subsequent sales to third parities do not alter the harm occasioned at the time of purchase.

## VIII. IT IS UNJUST TO SEIZE A COLLATERAL INSURANCE ASSET OF THE VICTIM TO REDUCE THE LIABILITY OF THE TORTFEASOR WHO PAID NOTHING FOR THE ASSET.

### A. The Offset for Insurance Is a Colossal Favor to an Undeserving Recipient.

Subrogation Plaintiffs' consolidated complaint [Doc. #283] allege that they made claim payments and associated adjustment expenses "in an amount exceeding one billion dollars ($1,000,000,000+)." (Id. ¶ 23.)

33

**B. Dependants Knew That Stolen Cars Constitute a Major Risk to Life and Limb.**

The liability of defendants stems from the reckless disregard for the safety of it consumers. These defendants deliberately manufactured countless vehicles for a decade that lacked the theft prevention devices required by FMVSS No. 114 and Industry Standards.

These theft provoking vehicles exposed the owners, passengers, innocent bystanders, responding police officers and the public to property loss, personal injury and even death often associated with vehicular thefts. Police officers responding to vehicle thefts face serious safety threats. Officers responding to and/or encountering a Hyundai or Kia theft have been shot at, and stabbed when responding. In *Tonawanda*, a police officer stopped a driver in a stolen Kia Sportage SUV and was dragged and "thrown onto the road" when the driver of the stolen Kia attempted to flee. [Doc. 175 pgs 27-30 consolidated governmental consolidated governmental Entities complaint entities complaint.]

It has been well know and recognized for over fifty years by the U.S. Department of Transportation ("DOT") that"stolen cars constitute a major hazard to life and limb … [and] cause unreasonable risk of accident, personal injury, and

34

death[.] " 33 Fed. Reg. 6,471 (Apr. 27, 1968). The DOJ found significant number of stolen vehicles would result in personal injury.

> [T]here were an estimated 94,000 stolen cars involved in accidents in 1966, and more than 18,000 of these accidents resulted in injury to one or more people. On a proportionate basis, 18.2 percent of the stolen cars became involved in accidents, and 19.6 percent of the stolen-car accidents resulted in personal injury. The same study predicted that automobile thefts in 1967 total about 50,000; about 100,000 of these stolen cars could be expected to become involved in highway accidents. ***Comparing these figures with statistics for vehicles*** which are not stolen, the approximate rate for stolen cars would be some **200 times the normal accident rate** for other vehicles.

At all times these theft obliging vehicles were mass produced lacking required theft prevention causing a increased risk of accidents, personal injury and death but little did Kia or Hyundai care as long as its profits increased.

Inconceivable, the Leadership Declarations relied upon by the lower court fail to mention defendants' prominent role in creating this public carnage —instead they react by handing over class members insurance assets to defendants to mitigate responsibility and give undue credit to nebulous defenses.

Class counsel and his leadership fellows in a rush to settlement focused solely upon perceived weaknesses of Plaintiffs action and ignored the egregious and reprehensible conduct of defendants committed over 9 million times for over a

35

decade with the primary aim of profit over people and who now propose to appropriate and use the insurance belonging to those it victimized.

### C. The Collateral Source Rule and its Policy Applies in California.

#### 1. The Parties Stipulated That the Settlement Agreement Shall Be Governed and Construed in Accordance with California Substantive Law.

Application of the Collateral Source Rule (CSR) precludes defendants from mitigating its damages by seizing an insurance asset of insured class members, who paid  premiums for such coverage. The higher payments to uninsured class members penalize class members who had the foresight to insure their vehicles and pay substantial premiums, deductibles and co pays. California substantive law and inherent public policy applies the CSR. If the CSR doesn't permit any offset in the event of a judgment against the tortfeasor, the ASA should not have included such a reduction—particularly in these circumstances where the offenses are not merely negligent but premeditated and intentional in substance.

The parties agreed to apply California substantive law regarding the amended settlement agreement stating Under X Miscellaneous A. Choice of law:

> This settlement Agreement shall be governed by and *construed* in accordance with the  substantive law of the State of California

36

without giving effect to any choice or conflict of law provision or rule that would cause the application of the laws of any other jurisdiction.

When parties voluntarily agree to submit to suit in a given venue, the court will generally not disturb that choice. See *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972) ("the forum selection clause should control absent a strong showing that it should be set aside") In accord, *Cadapult Graphic Systems*, 98 F. Supp. 2d at 564-65 (citing M/S *Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)). *Kierstein v. Ostlund* Civ. No. 13-07513 (SRC) (D.N.J. Jul. 28, 2014) It is well established that a forum selection clause is presumptively valid and enforceable. *Arentowicz v. Cap Gemini Ernst Young U.S. LLC* Civ. No. 03-5881 (WGB) (D.N.J ) Jul. 16, 2004)

## 2. The General Rule in Federal Court Is That the CSR Is Applied.

The general rule in the federal courts is that the collateral source rule is applied and defendants cannot show payments of this kind in mitigation. See *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 4 A.L.R.3d 517 (9th Cir. 1962). [ (holding that Jones Act recovery was not subject to reduction by amount of unemployment benefits received and noting that federal courts recognize the collateral source rule as a "generally prevailing" federal rule)]

37

### 3. The CSR Expresses a Firmly Established Policy Judgment to Encourage Citizens to Maintain Insurance to Protect Property Losses and Personal Injury.

*Helfend v. Southern California Rapid Transit District*, 2 Cal.3d 1 (1970) is a seminal case regarding the collateral source rule to the effect that a personal injury plaintiff is rarely over-compensated despite the collateral source rule because he/she has to pay attorneys fees and costs. See also *Lund v. San Joaquin RR*, 31 Cal.4th 1, (2003):

> "As we have explained, the collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. . . . If we were to permit a tortfeasor to *10 mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance." (*Helfend*, supra, 2 Cal.3d at p. 10.) See also (*Arambula v Wells*, 72 Cal.App.4th 1006 (1999)..."[5]

---

[5] *Note—People v. Hamilton*, 114 Cal.App.4th 932 (2004) recently extended the collateral source rule to restitution claims in criminal court, noting that "it is firmly established as the California rule." quoting 6 Witkin, Cal. Law, Torts, §1388.

**D.     It is Repugnant to Shift the Benefits of Plaintiffs' Insurance to the Tortfeasor.**

It is repugnant to shift the benefits of the plaintiff's insurance contract to the tortfeasor in the form of reduced liability when the tortfeasor paid nothing toward the insurance benefits while the insured pays the premiums, deductibles and often co-pays to obtain and maintain and the insurance.

**E.     The Majority Rule and Restatement of Torts  in Product Cases Apply the Collateral Source Rule.**

The Restatement (Second & Third) of Torts § 920A (2)  defines the traditional common-law collateral-source rule that:

> "payments made to or benefits conferred on the injured party from other sources are not credited against the tortfeasor's liability, although they cover all or a part of the harm for which the tortfeasor is liable."

> The majority rule is that the application of the CSR which forbids the

defendant taking any credit or reduction for payments made by an insurer to its insured.

Moreover, the court's reasoning that somehow the subrogation track cases address this issue, failed to recall that the court dismissed all subrogation track claims based upon a lack of personal jurisdiction over defendants.  (Doc. #518)

39

**F.**   **The Treatment of  Insured Class Members in Relationship to Uninsured Members Offends Subsection D. Fed. R Civ Proc. 23e(2) (D)**.

Rule 23e(2) provides:

(2) Approval of the Proposal. If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

> D)  the proposal treats class members equitably relative to each other.

Penalizing class members who have insurance while paying more to those who chose not to insure is not equitable. The court should not approve of this unfair use of insurance.

## IX.   THE FORTY PER CENT DEDUCTION AFFORDED DEFENDANTS BY THE ASA IS UNJUSTIFIED AND UNREASONABLE.

In the event of a total loss due to a 'qualifying vehicular theft', the court allotted a 40% decrease in actual estimated damages based upon Black Book values, primarily to account for certain risks (defenses that Defendants consistently maintained that all Class Vehicles met the required Federal Motor Vehicle Safety Standards ("FMVSS").  (Leadership Supp.Decl. ¶ 5.)  And the defense of causation, arguing that the injuries were caused by intervening criminal acts of third parties.  See (Doc. 200 pg. 26 of 32)

40

Subsequent to the approval of 40% deduction [Doc. #200] the District Court entered Orders in the Governmental Track Case and Subrogation Track Case that the intervening act of theft does not break the causative chain because theft is foreseeable especially where the vehicle is theft friendly. And in regard to the defense relating to the non con-compliance with FMVSS No 114 allegation that, "The Vehicles do not comply with FMVSS No. 114 because they do not contain a meaningful anti-theft device, such as an immobilizer or any other effective anti-theft features that prevent the normal activation of the vehicle's engine without a key. The court wisely noted, "Nor do Defendants argue that they complied with FMVSS No. 114 by equipping the Vehicles with any other anti-theft device." (See generally Mot.; Reply.]

The defendants claim class vehicles are not in violation of FMVSS 114 is contrary to the plain language of the standard as well as the CFR sections that provide for self certification.

The second defense relied upon by the Judge to justify the discount was defendants' claim that the criminal act of theft breaks the causative chain. However, the district court on the subrogation track in its [IN CHAMBERS] Order Regarding Motion to Dismiss [217] on November 15, 2023 that argument and

41

allegations by subrogation plaintiffs that [defendants by] failing to provide certain vehicles with an Immobilizers or any other anti theft device was non compliant with FMVSS 114.id,

This coupled with defendants lack of any argument that they complied with FMVSS No. 114 by equipping the vehicle with any other anti-theft device resulted in a ruling that subrogation plaintiffs claims were not preempted. The court further ruled that the right of subrogation is purely derivative and therefore in the same position as the assignee of a claim and succeeds only to the right of the insured. (internal citation omitted)

In addition, the District Court ruled regarding causation that, as the California Supreme Court has stated, "under section 449 of the Restatement Second of Torts . . . foreseeability may arise directly from the risk created by the original act of negligence." *Ileto*, 349 F.3d at 1209 (quoting *Landeros v. Flood*, 17 Cal. 3d 399, 411 (1976)); see also Ileto, 349 F.3d at 1208 ("*[T]he fact that there was an intervening act by [thieves] is not fatal to the plaintiffs' claim on a Rule 12(b)(6) motion."*). Accordingly on November 17, 2023 Judge Selna ruled [Doc. #270] after much analysis that "*Accordingly, the Court finds the Complaint sufficiently alleges causation to state negligence and public nuisance claims."* The

42

court also remarked that; *Theft is the very foreseeable conduct that anti-theft devices specifically protect against.* A principle which this objector has contended.

Moreover when rampant theft is provoked by the intentional omission of required theft protective devices by the defendants it is unjust to reward these defendants with a forty per cent reduction in damages liability and penalizing the innocent consumer for defendants' misconduct.

## X. THE BLACK BOOK WHOLESALE VALUATION IS A DISSERVICE TO CLASS MEMBERS PARTICULARLY THOSE WITHOUT INSURANCE BECAUSE MEMBERS REPLACE VEHICLES AT RETAIL.

The selection of the Black Book reduces the value of this settlement for class members. The reimbursement payment for the total loss of a vehicle due to a qualifying theft or attempt is 60% of the Black Book value minus the total insurance payments or other payments. The Black Book value is the lowest valued index and dealer oriented focusing on wholesale and auction prices and generally attached a lower value than say the Kelly Bluebook or Edmunds which are more consumer oriented. The Plan reduces the payout of the fair market value by 40% due to purported risk of litigation. In light of that reduction a further reduction to the wholesale prices is overreach by defendants. When a consumer's vehicle is declared a total loss he or she shops for a new car at retail not wholesale.

43

## XI. THE RELEASE ENCOMPASSES CIRCUMSTANCES NOT COVERED BY SETTLEMENT AGREEMENT.

**The terms of the release are:**

> Releasers irrevocably release, waive, and discharge any and all past, present, and future liabilities, claims, causes of action, legal claims, damages, costs, attorneys' fees, losses, or demands that have been brought or could have been brought, whether known or <u>unknown</u>, existing or <u>potential</u>, or suspected or <u>unsuspected</u> relating to Class Vehicles.

The release is over-broad and vague. It purports to release unknown, potential and unsuspected claims relating to class vehicles. As we have observed almost 2.4 million class vehicles are ineligible for the update and will remain theft provoking and susceptible to theft based upon a conscious decision by the defendants not to retrofit these vehicles with theft compliant devices. In the event these cars are stolen in the future and would otherwise qualify as qualifying theft or attempted theft does the release appears to bar potential claims, unknown claims and unsuspected claims negate any recourse against defendants.

## XII. THE LACK OF ANY ESTIMATE OF THE AMOUNT OF EXPECTED TO BE PAID OUT TO CLASS MEMBERS IS TROUBLESOME.

### A. The Declaration of Defendants Expert Paid Expert Stockton Is Subjective and Not Credible.

44

The declaration of Mr. Stockton retained by defendants/class counsel in his summary paragraph No. 46 he states that based upon his experience with class settlements a claims made rate of 15 % is proper. He then proceeds to assume a 20% claims made rate and inexplicitly deduces that 225,000 class vehicles have been stolen. None of these number are supported in any manner by objective manner other than his own unstated experience.

His refusal to be candid about the amount he and his staffed were paid for his opinion is less than credible. He curiously volunteers that "for time working on this matter, Plaintiffs compensate my employer at a rate of $550.00 per hour * * with $65 to $185 per hour for staff members. (We assume that the $550.00 figure is his hourly recompense) Yet he fails to disclose the total he and his staff were paid for the job.

### B. The Claims Made Rate for Consumer Cases is Much Lower than Stated by Stockton.

The Take Rate of Claims made Consumer Cases According to Empirical Studies Average about 4% with Median of About 3.5%.

Since the plan benefits in the case of class vehicles that are not insured will not be offset by insurance, some class members will be reimbursed by the common fund. Notwithstanding this fact, the take rate in claims made in consumer cases is

45

usually quite low.   An Empirical Analysis of Federal Consumer Fraud Class
Action Settlements (2019-2020) by Day/Jones which  analyzed a set of 110
consumer fraud class actions settlements approved by federal courts from 2010 to
2020 found that typically only a small fraction of class members receive monetary
benefits from  the settlements.  In an aggregate 57 cases for which we had data
about class participation,53 the average take rate was 4.55%, and the median was
3.22%. Eleven settlements had take rates at or below 1%, and 42—the vast
majority of settlements—had take rates below 5%.

In this case at bar, the claims form is 8 pages long consisting of single
spaced type about font attached to the end of a long form notice of 15 pages.  The
eligibility requirements listed on page 17 are numerous and complex and states that
the claim must be submitted no later than 180 days after final approval.  Most class
members would not know when final approval might take  place. The claims
process is unduly burdensome and discourages claim submission.  The claims rate
will probably be lower than the norm as a result.

## XIII.  DEATH AND PERSONAL INJURY CLAIMANTS SHOULD HAVE AVAILABLE AN INTENSIVE SETTLEMENT PROCESS (ISP).

Class members who sustained personal injuries or even died as a result of
these thefts or attempted thefts are excluded and denied any relief. And if the

46

proposed plan is approved unfortunately more injuries and fatalities are likely to emerge. The lack of an ISP weighs in favor of the disapproval of the ASA in this matter. . .See *Moorer v. StemGenex Med. Grp* .,16-cv-02816-AJB-AHG (S.D. Cal. Oct. 26, 2021) ["Based on the intensive settlement process, the Court finds that the settlement was negotiated at arm's length and there is no evidence of collusion. Thus, this factor weighs in favor of approval"]

The number of injuries suffered or deaths is not a matter of record. Objector suggests that this information is probably available to defendants by use of serial numbers and this court should have access to that information before any final approval.

To manage the multitude of personal injury and wrongful death cases, Toyota and plaintiffs' counsel initiated an Intensive Settlement Process (ISP). This approach aimed to resolve claims efficiently without prolonged litigation. By October 2012, about two year later Toyota reported resolving or nearing resolution of 549 such cases.

## CONCLUSION

The amended settlement agreement should be disapproved by this court for all the reasons set forth above. Notwithstanding this agreement, all of the cars will

47

still be prone to theft and dangers that are associated with vehicular theft. The

defendants should fix these vehicles with passive immobilizers or other meaningful

theft prevention devices. The class members that lost the benefit of the bargain

should be fairly compensated. The ruse to use class members insurance to offset

the liability of Kia and Hyundia for their intentional tort a million times over

should not be permitted.

Date: January 31, 2025         _/s/ Donald K. Birner_

                                             Appellant

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**Certificate of Compliance for Briefs**

9th Cir. Case No. 24-7080

I am an attorney and Pro Se Objector.

This brief contains 10,175 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

DATED: January 31st 2025.

_/s/ Donald K. Birner_

**PROOF OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney of record for each party listed on the Court's electronic filing service on January 31, 2025 PSD

_/s/ Donald K. Birner_

Donald K. Birner

49